UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALVAREZ MILLINE, as Personal
Representative of the ESTATE of
ALVAREZ DEMETRIE MILLINE, Deceased

      Plaintiff,                        Case No. 17-cv-12723
                                      Hon. Matthew F. Leitman

v.

CORRECTCARE SOLUTIONS, LLC *et al.*,

      Defendants.

_____/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No.
82) AND (2) GRANTING CERTAIN DEFENDANTS LEAVE TO RENEW
MOTION FOR SUMMARY JUDGMENT**

In 2016, Alverez Demetrie Milline ("AD Milline") tragically died of a

pulmonary embolism while in custody at the Macomb County Jail. In this action,

the personal representative of AD Milline's estate ("Plaintiff[1]"), contends that "the

systemic negligence" of several health care professionals who treated AD Milline at

the jail "was the driving force behind" his death. (Pla.'s Am. Resp. to Mot. for

Summ. J., ECF No. 105, PageID.3608.) But Plaintiff has not asserted a claim of

medical malpractice against these professionals. Instead, he primarily claims that

---

[1] The plaintiff is also named Alverez Milline. For ease of reference, the Court will
refer to him as "Plaintiff."

1

the professionals and their employer, Correctcare Solutions, LLC ("CCS"), were deliberately indifferent to AD Milline's serious medical needs in violation of AD Milline's Eighth Amendment rights.  Plaintiff also brings a common-law negligence claim under Michigan law.

The Defendants have filed a motion for summary judgment. (*See* Mot. for Summ. J., ECF No. 82.)  The motion is **GRANTED IN PART AND DENIED IN PART.**  As explained below, while Plaintiff has identified many apparent errors by the individual Defendants and while he may have had a viable medical malpractice claim against all of them, his Eighth Amendment claim – which requires a higher showing of culpability – fails as a matter of law against all Defendants other than Nurse Practitioner Temitope Olagbaiye and CCS.  Thus, the Court will grant summary judgment on Plaintiff's Eighth Amendment claim in favor of all Defendants besides Olagbaiye and CCS.  However, for the reasons explained below, the Court will permit Olagbaiye and CCS to renew their motion for summary judgment on Plaintiff's Eighth Amendment claim.  Finally, Plaintiff may not pursue a common-law negligence claim against any of the Defendants because that claim sounds in medical malpractice, and Plaintiff failed to comply with the requirements of Michigan law governing malpractice actions.

**I**

**A**

On May 12, 2015, AD Milline began a period of incarceration at the Macomb County Jail.  The jail is owned and operated by the Charter County of Macomb. The County contracts with CCS to provide medical care to the inmates.

While in custody, AD Milline had several interactions with CCS staff that are relevant to the claims in this action.  The Court provides an overview of the pertinent interactions in this factual background section and then provides additional information, as appropriate, in the legal analysis sections that follow.

**B**

When AD Milline first arrived at the Macomb County Jail, he was screened by Nurse Sarah Herman, a CCS employee. (*See* Medical Records, ECF No. 83, PageID.1520-1525.)  During this screening, AD Milline apparently reported to Herman that he had a history of pulmonary emboli. (*See* Dep. of Avery Hope, Nurse at the Macomb County Jail, at 15, ECF No. 95-10, PageID.2739.)  Herman did not note that history in AD Milline's receiving screen report, but she did schedule him for a sick call visit with a health care professional so that the professional could address that history, if necessary. (*See id*.)

**C**

On May 16, 2015, AD Milline filled out a CCS Health Service Request (known as a "kite") in which he stated that his "lungs are hurting very badly" and that he "has a history of pulmonary embolisms [sic] (blood clots)." (Medical Records, ECF No. 83, PageID.1647.)  On May 18, 2015, in response to that kite, and in apparent response to AD Milline's report of pulmonary emboli during his initial screening, AD Milline was evaluated by Nurse Avery Hope, a CCS employee.  (*See id.*; *see also id.,* PageID.1623.)  Hope observed that AD Milline had normal vital signs, no distress, warm and dry skin, no swelling or redness in his lower legs, no complaint of leg pain, normal gait, clear sounding lungs, and a regular sounding heart.  (*See id.*, PageID.1623.)  In her progress notes, Hope also included a reference to AD Milline's history of pulmonary emboli. (*See id.*)  At the conclusion of the evaluation, Hope scheduled AD Milline for a follow-up visit with Nurse Practitioner Temitope Olagbaiye.  (*See id.*)  Olagbaiye was a health care professional with more advanced medical training who would be better able to determine how to address AD Milline's history and symptoms of pulmonary emboli.

Hope did not request copies of AD Milline's prior medical records and did not add his history of pulmonary emboli to his "problem list" in CCS's Electronic Record Management Application ("ERMA"). (*See* Hope Dep. at 18-20, 24-25, ECF No. 95-10, PageID.2740-2742.)  The ERMA "problem list" is a portion of an

4

inmate's medical record that appears on the first page of the inmate's medical chart and is available for review when an inmate reports for a medical evaluation. (*Id.* at 20, PageID.2740.)

On May 19, 2015, AD Milline appeared for the appointment with Olagbaiye that Hope had scheduled. (*See* Medical Records, ECF No. 83, PageID.1497.) However, AD Milline declined to be treated by Olagbaiye because he could not afford to pay for the services. (*See id.*)   Olagbaiye advised AD Milline that his decision to decline treatment could result in a "poor outcome," but Olagbaiye did not tell AD Milline that he would not be denied medical care based upon his inability to pay. (*See* Olagbaiye Dep. at 63-64, ECF No. 95-13, PageID.2794.) Olagbaiye also told AD Milline that he should send a kite to the jail's medical staff if he needed medical treatment or evaluation in the future. (*See* Medical Records, ECF No. 83, PageID.1497.)

## D

On May 22, 2015, Nurse Jamie Kneisler conducted an initial health assessment on AD Milline.  (*See* Kneisler Dep. at 10, ECF No. 95-11, PageID.2756.) Despite having access to notes from AD Milline's previous visits to medical, Kneisler failed to record or address AD Milline's history of pulmonary emboli. (*See id.* at 10-12, PageID.2756.)

5

**E**

On June 30, 2015, AD Milline returned to the jail's medical unit complaining of pain in his ribs.  (*See* Medical Records, ECF No. 83, PageID.1622.)   Hope evaluated him during this visit.  She noted that he complained of pain in his lungs that "feels like the pain he had when he was dx with blood clots." (*Id.*)   Hope observed that AD Milline's lungs sounded clear, his heart rate was regular, there was no swelling, no respiratory distress, and his skin was warm and dry. (*See id*.)  But she nonetheless proceeded to perform two electrocardiogram ("EKG") tests. (*See id*.)  Both EKG reports indicated "left-precordial ST elevation, compatible with early polarization." (*Id.*, PageID.1501.)   And both reports also indicated that this EKG "variant" was normal.  (*Id.*)

Despite the normal variants of the EKG reports, Hope decided to refer AD Milline to Olagbaiye for further evaluation. (*See* Medical Records, ECF No. 83, PageID.1622.)  She promptly delivered the EKG result to Olagbaiye and informed Olagbaiye about AD Milline's history and symptoms. (*See id.*)  Olagbaiye did not believe that it was necessary for him to personally evaluate AD Milline at that time. Instead, after reviewing the normal EKG results and hearing the symptoms and history from Hope, Olagbaiye prescribed AD Milline 325 milligrams of Tylenol three times per day. (*See id.*, PageID.1609.)

6

**F**

On July 11, 2015, AD Milline returned to the jail's medical unit complaining of chest pain and a burning sensation in the middle of his chest. (*See id.,* PageID.1576-1585.)  The on-call nurse observed that AD Milline's vital signs, respiration, and the sound in his lungs and heart, were all normal and that his pulse was regular.  (*See id*., PageID.1579-80.) The nurse also administered an EKG, and the results of that test came back normal. (*See id.*, PageID.1500.)  The nurse shared the results with Olagbaiye, and Olagbaiye prescribed Maalox Advanced, an antacid. (*See id*., PageID.1609.)

The next day, July 12, 2015, AD Milline returned to the medical unit where he again complained of chest pain.  Nurse Cynthia Deview assessed him during that visit. (*See id*., PageID.1586-1591.) She determined that his vital signs were normal and that his skin was warm and dry. (*See id*.)  She also reviewed a medical record which indicated that he had no "medical history." (Deview Dep. at 32, ECF No. 95-19, PageID.2910.)  She then consulted the ERMA pathway for "gastrointestinal complaints." (*Id.* at 31, PageID.2910.)  Based upon her review of that pathway, she directed AD Milline to drink more water, increase his activity level, and to be mindful of his diet. (*See* Medical Records, ECF No. 83, PageID.1586-1591.)  She also scheduled him for a sick call visit on July 13 (the next day) with a healthcare provider to evaluate what Deview believed were gastrointestinal issues. (*See id*.)

When the time for that visit arrived, AD Milline refused to attend because he reported "feeling a lot better." (*Id.*, PageID.1496.)

Also, on July 13, 2015, Olagbaiye ordered a sick call visit to evaluate AD Milline's multiple complaints of chest pain. (*See id.*, PageID.1605.) Olagbaiye initiated this sick call on his own accord based upon his concerns related to AD Milline's chest pain. (*See id.*) The sick call occurred on July 14, 2015. (*See id.*, PageID.1495.) When Milline came to the health care unit that day, he refused to be treated by Olagbaiye for his recurring chest pain because he was "feeling a lot better." (*Id.*)

## G

On September 30, 2015, AD Milline again reported experiencing chest pain. (*See id.*, PageID.1613.) On that date, he was seen by Dr. Lawrence M. Sherman, a CCS employee. (*See id.*, PageID.1613.) Dr. Sherman noted that AD Milline was awake and alert, was ambulatory with no apparent distress, his neck was supple without jugular vein distention, his lungs were clear, and he did not have rapid breathing (tachypnea), shortness of breath (dyspnea), or wheezing. (*See id.*) Dr. Sherman also noted that there was mild tenderness on the right side of AD Milline's chest above the eighth rib, and his heartbeat was normal. (*See id.*) AD Milline's right calf also had an increase in fibrous tissue (chronic induration), but there was no tenderness. (*See id.*) Dr. Sherman's impression was that AD Milline was most

8

likely suffering from musculoskeletal chest wall pain and that there was little likelihood of recurrent pulmonary embolism. (*See id.*)  His treatment plan was to prescribe a pain reliever and to conduct chest x-rays. (*See id.*)   Chest x-rays were ordered (*see id.*, PageID.1604), and Motrin was prescribed. (*See id.*, PageID.1608.)

The chest x-rays were taken, and a radiologist provided a report stating that he found no acute cardiopulmonary process. (*See id.*, PageID.1649-1651.) Olagbaiye then reviewed the report. (*See* Olagbaiye Dep. at 100-101, ECF No. 95-13, PageID.2803-2804.)  Because the report had normal results, Olagbaiye did not inform Dr. Sherman of the results. (*See* Sherman Dep. at 63-64, ECF No. 95-14, PageID.2834.)  This was consistent with the "typical" practice of Olagbaiye and Dr. Sherman. (*Id.* at 64, PageID.2834.) Under that practice, Olagbaiye would tell Dr. Sherman about x-ray reports only if the reports detailed a problem and would not follow-up with Dr. Sherman if a report stated that the x-rays were normal. (*See id.*)

## H

On October 23, 2015, AD Milline submitted a kite reporting sharp pain in his lungs when he inhaled. (*See* Medical Records, ECF No. 83, PageID.1643.)  His kite was received by Nurse Michael Bey-Shelley at 8:00 am. (*See id.*)   Bey-Shelley examined AD Milline and did not detect any signs of distress at that time. (*See id.*)

Four days later, on October 27, 2015, Nurse Monica Franks attempted to see AD Milline to address the pain reported in his October 23 kite. (*See id.*,

PageID.1491.)   However, AD Milline refused treatment because he was "feeling a lot better." (*Id.*)

On November 11, 2015, AD Milline submitted another kite reporting lung pain when he inhaled and exhaled. (*See id.*, PageID.1642.)  In this kite, AD Milline reported that this had been an ongoing issue for about two months. (*See id.*)  On November 16, 2015, Deview attempted to see AD Milline to address the issues raised in this kite.  But AD Milline again refused treatment and said he was feeling better. (*See id*.)

# I

On March 1, 2016, AD Milline returned to the medical unit for complaints of chest pain and shortness of breath. (*See id*., PageID.1567.)  He was seen by Nurse Allison LaFriniere. (*See* LaFriniere Dep. at 23, ECF No. 95-20, PageID.2921.)  Because his complaint of chest pain was of an urgent nature, LaFriniere did not pause to review his full medical record.  Instead, she referred to an ERMA pathway for "coronary heart disease" and conducted the assessment recommended by that pathway.  (*Id*. at 25, PageID.2922.)  As part of that assessment, she recorded that his vital signs were within normal limits, his respiration was normal, his lungs sounded clear, his pulse was regular, and that there was no abnormal jugular vein distention. (*See* Medical Records, ECF No. 83, PageID.1569-1570.)  She also performed an EKG on AD Milline.  The results were normal. (*See id.*, PageID.1499.)

LaFriniere sent the results of the EKG to Olagbaiye.  (*See* LaFriniere Dep. at 29, ECF No. 95-20, PageID.2923.) She then called Olagbaiye while AD Milline was still in the medical unit. (*See id.* at 30, PageID.2923.)  Olagbaiye asked if AD Milline was taking any blood thinners or other medications. (*See id.* at 31, PageID.2923.) LaFriniere told him that "from what I could see right away," AD Milline's chart did not reflect that he had received blood thinners. (*Id*.)  After hearing from LaFriniere, Olagbaiye prescribed AD Milline 325 mg Tylenol three times per day for the next three days and 81 mg chewable aspirin once per day for 180 days. (*See* Medical Records, ECF No. 83, PageID.1606.)  Olagbaiye also directed that AD Milline's temperature be monitored twice a day for the next three days. (*See id*., PageID.1648.) And while LaFriniere does not have a specific memory of telling the nurses who came in after her to "look out" for AD Milline, she is "sure" that she must have done so. (LaFriniere Dep. at 39, ECF No. 95-20, PageID.2933.)

The next day, March 2, Dr. Sherman reviewed and signed off on AD Milline's normal EKG results. (*See* Sherman Dep. at 81-82, ECF No. 95-14, PageID.2839.) Dr. Sherman did not provide the medical staff any additional orders regarding AD Milline's treatment. (*See* LaFriniere Dep. at 36, ECF No. 95-20, PageID.2924.)

## J

On March 4, 2016, AD Milline came to the medical unit initially complaining of shortness of breath and a non-productive cough.  (*See* Medical Records, ECF No.

83, PageID.1621.)  He was seen by Nurse Linda Parton.  When he spoke to Parton, he did not tell her about his shortness of breath and cough.  Instead, he said "he just didn't feel right, will you take my vitals?  He didn't say to [Parton] he was having chest pain or shortness of breath or anything, he just said, I'm not feeling right, can you look at me?" (Parton Dep. at 45, 51, ECF No. 95-12, PageID.2772.)

Parton then took AD Milline's vitals – including his pulse oxygen level that measures the amount of oxygen in his blood – and found that they were all within normal limits. (*See id.* at 45-47, PageID.2772-2774.) Based upon the normal vital readings, Parton determined that AD Milline was "okay" and that no further immediate evaluation or treatment was necessary. (*Id*.). She then added AD Milline to the list of inmates to be seen by a physician and instructed him to return to the prison medical unit if his symptoms persisted or worsened. (*See id*.)

A few hours later, AD Milline returned to the medical unit reporting chest pain and shortness of breath. (*See* Medical Records, ECF No. 83, PageID.1558-1566.)  He was seen by Deview. (*See id.*)  She took his vitals and determined that his blood pressure and heart rate were slightly elevated. (*See id.*) She also administered an EKG. (*See id.*)  The EKG yielded "abnormal" results.  It showed a "moderate right-precordial repolarization disturbance" and suggested consideration of "ischemia or LV overload". (*See id.*, PageID.1498; *see also* Medical Records, ECF No. 97, PageID.3182.)

12

Deview then called Olagbaiye.  She informed him of AD Milline's "continued symptoms of chest pain and shortness of breath." (Medical Records, ECF No. 83, PageID.1620; *see also* Olagbaiye Dep. at 121, ECF No. 95-13, PageID.2809.)  She also told Olagbaiye of the "[c]hanges in [AD Milline's] EKG and vital signs" (Medical Records, ECF No. 83, PageID.1620), and she "read" the EKG report to him. (Olagbaiye Dep. at 122, ECF No. 95-13, PageID.2809.)  Deview did not fax the written EKG report to Olagbaiye, and Olagbaiye never reviewed that report. Olagbaiye considered the abnormal aspects of the EKG non-specific and not indicative of a pulmonary embolism. (*See id.* at 124-127, ECF No. 95-13, PageID.2809-2810.)  Olagbaiye directed that AD Milline be scheduled for a follow-up appointment (with Olagbaiye) on March 7, 2016. (*See* Medical Records, ECF No. 83, PageID.1621.) AD Milline was instructed to return to the medical department if there were any changes and he indicated that he understood that instruction. (*See id.*)

### K

On the morning of March 7, 2016, the medical unit received a call from corrections staff, reporting that AD Milline was having difficulty breathing. (*See id.*, PageID.1616.) He was given oxygen and taken by wheelchair to the medical unit. (*See id.*) Shortly after arriving in the medical unit, AD Milline became unresponsive, and staff called EMS and performed CPR.  EMS arrived at approximately 11:29 a.m. and transported AD Milline out of the Macomb County Jail by 11:40 am. (*See id.*)

At approximately 12:09 p.m., Olagbaiye received a phone call from the emergency room at McLaren Hospital, informing him that AD Milline had died. (*See id.*, PageID.1611.)

## L

Following AD Milline's death, Dr. Daniel Spitz performed an autopsy. (*See* Autopsy Rpt., ECF No. 95-22.)  Dr. Spitz concluded that AD Milline experienced two kinds of pulmonary emboli: acute and organizing.   An acute pulmonary embolism is an embolism that is "hours to days old"; an organizing pulmonary embolism is an embolism that could be "weeks" or "years" old. (Spitz Dep. at 12, ECF No. 95-23, PageID.2943.)  Both types of emboli had filled AD Milline's right and left main pulmonary and segmental arteries and caused his death. (*See* Autopsy Rpt., ECF No. 95-22, PageID.2937-2938.)

## II

Plaintiff, as Personal Representative of the Estate of AD Milline, filed this action on August 18, 2017. (*See* Comp., ECF No. 1.) Plaintiff originally asserted claims against Macomb County, certain county officials, CCS, and certain CCS employees.   (*See* Compl., ECF No. 1.) Plaintiff has since settled with Macomb County and the county's officials, and he has amended the Complaint twice.   The sole remaining claims (counts II-V of the Second Amended Complaint) are against CCS and the following CCS employees: David Arft (a CCS Health Services

14

Administrator), Monica Cueny (a CCS Director of Nursing), Dr. Sherman, Nurse

Practitioner Olagbaiye, Nurse Deview, Nurse LaFriniere, Nurse Hope, and Nurse

Parton. (*See* Sec. Am. Compl., ECF No. 53.)  The Court will refer to these employees

collectively as the "CCS Defendants."

Plaintiff has lumped several theories against CCS and many of the CCS

Defendants together in some of the remaining counts.  The following is the Court's

best effort at summarizing each remaining count:

- In <u>Count II</u>, Plaintiff alleges that CCS, Arft, Cueny, and Dr. Sherman (all in their official capacities) approved and/or ratified official policies and/or customs at CCS involving (a) the delivery of seriously deficient healthcare to inmates at the Macomb County Jail and (b) the failure to correct known healthcare deficiencies at the jail.   Plaintiff claims that through these acts and omissions, these Defendants violated AD Milline's Eighth Amendment rights and "directly caused the death" of AD Milline. (Sec. Am. Compl., ECF No. 53, PageID.549.)

- In <u>Count III</u>, Plaintiff asserts a claim of supervisory liability against Dr. Sherman.  This claim alleges that Dr. Sherman supervised Olagbaiye and failed to take action to prevent the delivery of deficient medical care to AD Milline by Olagbaiye.

- In <u>Count IV</u>, Plaintiff alleges that Dr. Sherman, Nurse Practitioner Olagbaiye, Nurse Deview, Nurse LaFriniere, Nurse Hope, and Nurse Parton (in their individual capacities) were deliberately indifferent to AD Milline's serious medical needs in violation of the Eighth Amendment.[2]

---

[2] In Plaintiff's Second Amended Complaint (*see* ECF No. 53), Plaintiff purports to bring the claims in Count IV against all of the CCS Defendants in their individual capacities.   But in Plaintiff's response to Defendants' Motion for Summary Judgment, Plaintiff asserts the viability of these claims against only the Defendants identified above. (*See* Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2347.)

- In <u>Count V</u>, Plaintiff asserts a claim entitled "gross negligence" against CCS and the CCS Defendants.  This count asserts that these Defendants breached their common-law duties to "act with ordinary care and provide … adequate medical care." (*Id.*, PageID.571.)

On August 1, 2019, all Defendants filed motions for summary judgment. (*See* Mots. for Summ. J., ECF Nos. 82, 84, 85, 86.)  Only the motion filed by CCS and the CCS Defendants identified above remains pending. (*See* CCS Mot., ECF No. 82.)  In that motion, CCS and the CCS Defendants seek summary judgment on Counts II, III, IV, and V of Plaintiff's Second Amendment Complaint.  (*See id.*)

# III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.  Indeed, "[c]redibility

16

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## IV

### A

Plaintiff brings his claims against CCS and the CCS Defendants under 42 U.S.C. § 1983. "To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).) "The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Id.* (quoting *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).

### B

#### 1

"The Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cty., Ky.*, 975 F.3d 554, 566 (6th Cir. 2020). *See also Estelle v. Gamble,* 429 U.S. 97, 104 (1976). This obligation arises under the Eighth

Amendment to the United States Constitution, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle*, 429 U.S. at 104).

An Eighth Amendment claim alleging a "denial of medical care has objective and subjective components." *Jones*, 625 F.3d at 941.   The contours of those components are well-established.

"The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).   "Such a medical need has been defined as one 'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

"The subjective element requires 'an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Id.* (quoting *Blackmore*, 390 F.3d at 895; international quotation marks from *Blackmore* omitted).   "Officials have a sufficiently culpable state of mind where officials act with 'deliberate indifference' to a serious medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834). "Under this standard, 'the plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Griffith*, 975 F.3d at 568

18

(quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)). "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

"[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones*, 625 F.3d at 944. Indeed, "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment," federal courts hesitate to review "medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw,* 358 F.3d 377, 385 (6th Cir. 2004). *See also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Groce v. Correctional Medical Svcs., Inc.*, 400 F. App'x 986, 986, 988 (6th Cir. 2010) (affirming district court holding that "treatment at issue amounted, at most, to medical malpractice rather than the sort of deliberate indifference needed to establish a constitutional claim" and noting that "[o]rdinary medical malpractice does not satisfy the subjective component" of a deliberate indifference claim). "However, the Sixth Circuit has also recognized that [p]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. Indeed,

deliberate indifference may be established in cases where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment." *Jones*, 625 F.3d at 944-45 (internal punctuation omitted).

## 2

The Court turns first to Plaintiff's deliberate indifference/deprivation of medical care claims against nurses Deview, LaFrineire, Hope, and Parton that are included in Count IV of the Second Amended Complaint. The parties vigorously dispute whether Plaintiff has satisfied the objective component of these claims. Plaintiff contends that AD Milline's pulmonary emboli were sufficiently serious to meet that component. (*See* Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2374.) Defendants counter that AD Milline's emobli do not satisfy the objective component of this claim because during the relevant time period, the emboli had not yet been formally diagnosed and were not obvious. (*See* Def.'s Mot. Summ. J., ECF No. 82, PageID.1177.) For purposes of this ruling, the Court need not resolve the dispute over whether AD Milline's pulmonary emboli satisfy the objective component of Plaintiff's claims against nurses Deview, LaFrineire, Hope, and Parton. That is because Plaintiff has failed to present sufficient evidence to satisfy the subjective element of his claims against these Defendants. Thus, Plaintiff's deliberate indifference/deprivation of medical care claims against the

nurses would fail even if Plaintiff had established the objective component of his claims.  The Court will examine the claim against each nurse in turn below.

### a

Plaintiff has not presented sufficient evidence to establish the subjective element of his claim against Hope.  As described above, Hope had two interactions with AD Milline that may have related to his pulmonary emboli.  First, on May 18, 2015, she saw AD Milline in response to his complaints of lung pain and his reference to a history of pulmonary emboli.  (*See* Medical Records, ECF No. 83, PageID.1623.)  She confirmed that his vital signs were normal and scheduled him for a follow-up visit with Olagbaiye the next day. (*See id*.)  Second, on June 20, 2015, she again saw AD Milline for complaints of chest pain. (*See id.*, PageID.1622.) During this evaluation, Hope confirmed that his vital signs were normal and that he was not in respiratory distress. (*See id*.)  She then administered two EKG tests, and after reviewing the results of the tests, she referred AD Milline for further evaluation by Olagbaiye (who ultimately decided that additional evaluation was not necessary). (*See id.*)  Simply put, both times that Hope saw AD Milline, she evaluated his condition, determined that he was not in immediate distress, and arranged for a reasonably prompt follow-up evaluation by a medical professional with more advanced training.  She did not disregard the risk posed to AD Milline.  On the contrary, she presented AD Milline's case to a professional better equipped to

21

evaluate and treat it, and she did so within a reasonable time frame.  Plaintiff has failed to show that Hope acted with deliberate indifference.

Plaintiff counters that Hope failed to request AD Milline's medical records and failed to properly record his history of pulmonary emboli in his chart and/or the ERMA.  But those alleged failures by Hope do not erase the fact that she took affirmative steps to secure additional evaluation and treatment for AD Milline.  At most, Hope's alleged failures to secure records and make complete entries in AD Milline's chart amount to "negligent behavior [that] do[es] not suffice to establish deliberate indifference." *Griffith,* 975 F.3d at 568 (quoting *Rhinehart*, 894 F.3d at 738).

## b

Plaintiff has not presented sufficient evidence to establish the subjective component of his claim against LaFriniere.  As described above, LaFriniere had one interaction with Milline.  On March 1, 2015, LaFriniere saw AD Milline for complaints of chest pain.  (*See* LaFriniere Dep. at 23, ECF No. 95-20, PageID.2921.) She assessed AD Milline for possible coronary heart disease. (*See id*. at 25, PageID.2922.)  As part of that assessment, she confirmed that his vitals were normal, that his lungs sounded clear, and that his pulse was regular.  (*See* Medical Records, ECF No. 83, PageID.1569-1570.)  She also performed an EKG on AD Milline, and the results of that test were normal.  (*See id.*, PageID.1499.)

22

After completing the EKG, she contacted Olagbaiye to review AD Milline's condition, and she reported her findings and the EKG result to Olagbaiye. (*See* LaFriniere Dep. at 29, ECF No. 95-20, PageID.2923.)   She also expressed to Olagbaiye her "concern" that AD Milline was not receiving any type of anticoagulant. (*Id*. at 31, PageID.2923.)   Olagbaiye listened to her reports and concern.  He then prescribed AD Milline Tylenol and aspirin and directed that the medical staff monitor AD Milline. (*See* Medical Records, ECF No. 83, PageID.1606.)

LaFriniere did not disregard a serious risk to AD Milline's health.  Instead, she evaluated his condition, administered an EKG, reported the result of that test to a professional with more advanced medical training (Olagbaiye), expressed her concern about AD Milline's condition to that professional, and then followed the direction given by the professional.  Plaintiff has failed to show that these actions amount to deliberate indifference.

Plaintiff counters that LaFriniere was deliberately indifferent when she knowingly misrepresented AD Milline's medical history to Olagbaiye.   More specifically, Plaintiff says that when LaFriniere contacted Olagbiaye, LaFriniere falsely told Olagbaiye that (1) she (LaFriniere) had reviewed Milline's medical records and (2) the records said nothing about whether AD Milline had been prescribed anticoagulant medication. (*See* Pla.'s Resp. to Mot. for Summ. J., ECF

No. 95, PageID.2385.)  But this is not a full and fair reading of the record.  LaFriniere testified that when a patient comes to her complaining of chest pain – as AD Milline did – she "do[esn't] have time to review the entire chart." (LaFriniere Dep. at 26, ECF No. 95-20, PageID.2922.)  Instead, given the urgency of the situation, she immediately performs an exam "right then and there." (*Id*.)  And that is what she did with AD Milline.  Moreover, she testified that she told Olagbaiye, after performing that examination on AD Milline, that "*from what I could see right away*," AD Milline's "chart" did not reflect that he had been given anticoagulants. (*Id*. at 31, PageID.2923; emphasis added.)  Thus, contrary to Plaintiff's suggestion, LaFriniere did not misrepresent to Olagbaiye that she had thoroughly reviewed AD Milline's record and found no history of anticoagulants.  Plaintiff has failed to show that LaFriniere was deliberately indifferent.

### c

Plaintiff has not established the subjective component of his claim against Parton.  Parton only had one brief interaction with AD Milline related to his pulmonary emboli.  On March 4, 2016, she saw AD Milline after he initially complained of shortness of breath and a non-productive cough. (*See* Medical Records, ECF No. 83, PageID.1621.)  But when she spoke to him, he said only that he did not feel right, and he did not highlight any chest pains or shortness of breath. (*See* Parton Dep. at 45, 51, ECF. No. 82-3, PageID. 1247.)  She took his vitals –

24

including his pulse oxygen rate – and noted that they were normal.  She then determined that he was "okay" and not in need of immediate further evaluation of treatment.  (*Id.* at 45-47, PageID.1247.)  She placed him on a list to be seen by a health care professional and told him to return to the medical unit if his symptoms persisted or worsened. (S*ee id.*)

Parton did not disregard a risk to AD Milline.  She conducted what she believed to be an appropriate and sufficient evaluation given the nature of his complaints and statements to her, determined that no further immediate care was necessary, and scheduled AD Milline for a follow-up visit with a medical professional.  Plaintiff has failed to show that these actions amount to deliberate indifference.

It may be the case that Parton made an error in medical judgment when she determined that AD Milline was "okay" and not in need of further, immediate care.  But if she did, that would amount to negligence.  And as noted above, medical negligence is not deliberate indifference. *See Griffith*, 975 F.3d at 568.

### d

Plaintiff has not established the subjective component of his claim against Deview.  Deview had two primary interactions with AD Milline related to his pulmonary emboli.  First, she saw him on July 12, 2015, for complaints of chest pain. (*See* Medical Records, ECF No. 83, PageID.1586-1591.)   During that

evaluation, she reviewed a medical record that indicated that AD Milline had no "medical history," and she confirmed that his vital signs were all within normal limits.  (Deview Dep. at 31-32, ECF No. 95-19, PageID.2910-2911.)  She then decided to consult the ERMA pathway for gastrointestinal problems, and based upon advice in that pathway, she told AD Milline to drink more water, increase activity level, and to be mindful of his diet. (*See* Medical Records, ECF No. 83, PageID.1586-1591.)  She also scheduled AD Milline for a follow-up visit the next day with a medical professional.  (*See id*.)

Deview was not deliberately indifferent during this interaction with AD Milline.  She conducted an evaluation, provided him medical advice, and scheduled him for a prompt follow-up visit with a health care professional.  She may have made a serious error in consulting the ERMA pathway for gastrointestinal problems, but she did not disregard or ignore AD Milline's complaints and/or his situation.

Deview's second substantial interaction with AD Milline concerning his pulmonary emboli occurred on March 4, 2016.  He visited the medical department twice that day for chest pains and shortness of breath, and he saw Deview on his second visit.  (*See id.*, PageID.1558-1566.)  She took his vital signs and noted that his blood pressure and pulse rate were slightly elevated. (*See id.*)  She also administered an EKG, and the results of that test came back abnormal. (*See id*.)  She then called Olagbaiye to report the changes in AD Milline's vitals and his abnormal

26

EKG result. (*See* Deview Dep. at 43, ECF No. 95-19, PageID.2913.)   Olagbaiye determined that the vital signs were within normal range and that the abnormal EKG was not indicative of pulmonary embolism. (*See* Olagbaiye at 124-127, ECF No. 82-2, PageID.1226-1227.)   Olagbaiye told Deview to schedule AD Milline for a follow-up visit on Monday, March 7, and she did so.   (*See* Medical Records, ECF No. 83, PageID.1621.)   She then released AD Milline and told him to return to the medical unit if there were any changes to his condition.

Deview was not deliberately indifferent during this second encounter with AD Milline.   She evaluated his condition and promptly contacted a health care professional when the results of her evaluation raised concerns about AD Milline's medical condition.   She then followed the advice given to her by Olagbaiye.   Simply put, she sought further analysis of AD Milline's situation.   That is the opposite of knowingly disregarding a risk to his health.   For all of these reasons, Plaintiff has not shown that Deview acted with deliberate indifference to AD Milline's medical needs.

### 3

The Court now turns to Plaintiff's deliberate indifference claim against Dr. Sherman.   As with Plaintiff's deliberate indifference claims against the nurses, this claim fails because Plaintiff has not presented sufficient evidence to establish the subjective element of the claim against Dr. Sherman.

Dr. Sherman saw AD Milline just one time – on September 30, 2015.  During that visit, AD Milline complained of chest pain. (*See* Medical Records, ECF No. 83, PageID.1558-1566.)   Dr. Sherman took AD Milline's vitals and conducted a physical examination. (*See id.*)  And while Dr. Sherman does not have a specific memory of reviewing AD Milline's medical history, it is his "almost universal" practice to do so, and he believes that he did so in this case. (Dr. Sherman Dep. at 65-66, ECF No. 95-14, PageID.2835).  Dr. Sherman does recall that AD Milline had informed him (Dr. Sherman) of a history of pulmonary emboli. (*See id.* at 59-60, PageID.2833.)

After Dr. Sherman completed his examination of AD Milline, Dr. Sherman tentatively concluded that AD Milline was not suffering from an active embolism. Dr. Sherman based that conclusion upon his exam findings, AD Milline's vital signs, and upon his understanding that AD Milline had previously reported chest pains that did not yield significant findings on exam. (*See id.* at 60, PageID.2833.)   Dr. Sherman then ordered a follow-up x-ray of AD Milline's lungs to enable him to confirm his diagnosis.  (*See id.* at 61, PageID.2834.)  The x-ray was conducted, and a radiologist reviewed it and determined that it was normal. (*See id.*)

Dr. Sherman was not deliberately indifferent in connection with his September 30, 2015, treatment of AD Milline.  He evaluated AD Milline, made a diagnosis based upon the results of that diagnosis, and ordered a follow-up test to

help confirm the diagnosis. He did not knowingly disregard a serious risk to AD Milline's health. Plaintiff has therefore failed to show that Dr. Sherman acted with deliberate indifference.

Plaintiff counters that Dr. Sherman made a serious error in judgment when he treated AD Milline. Citing expert testimony, Plaintiff contends that Dr. Sherman had things exactly backwards when he concluded that AD Milline's prior history of chest pain suggested that AD Milline was not suffering from a pulmonary embolism. And Plaintiff similarly highlights expert testimony that the chest x-ray ordered by Dr. Sherman is not the proper test for diagnosing a pulmonary embolism. (*See* Dep. of Pla.'s expert Dr. Mahir Elder at 36-37, ECF No. 95-16, PageID.2864-2865.) Plaintiff may be right on both points. It certainly seems possible that Dr. Sherman did make a serious mistake in his assessment of AD Milline's condition. But a mistake in professional medical judgment falls short of deliberate indifference. *See Griffith*, 975 F.3d 554, 568 (6th Cir. 2020). Simply put, while Dr. Sherman's care may have been deficient, it was not "so woefully inadequate as to amount to no treatment at all," and it thus did not amount to deliberate indifference. *Id.* (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Plaintiff further claims that Dr. Sherman was deliberately indifferent because he did not personally review the x-ray of AD Milline's lungs that he (Dr. Sherman) had ordered. However, the x-ray did not go unreviewed. On the contrary, as noted

29

above, a radiologist reviewed the x-ray, and then Olagbaiye reviewed the radiologist's report and saw that it was normal. (*See* Dr. Sherman Dep. at 63-64, ECF No. 95-14, PageID.2834.)  Since the report indicated that the x-ray was normal, Olagbaiye did not bring the report to Dr. Sherman's attention.  That was consistent with the normal course of practice between Dr. Sherman and Olagbaiye – in which they did not discuss normal x-ray findings that did not require additional follow-up. (*See id.*)  Under these circumstances, the fact that Dr. Sherman did not personally review the x-ray or radiologist's report does not amount to deliberate indifference.

Finally, Plaintiff contends that Dr. Sherman exhibited deliberate indifference when, on March 2, 2016, he reviewed a report showing the results of AD Milline's EKG test that had been conducted the day before. (*See* Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2383.)  The report indicated that the results of the test were "normal," and the report contained the following note written by the nurse who administered the test: "X2 days pain on insp.  Hx pulm. Emboli, pneumonia 3 years ago." (EKG Report, ECF No. 97, PageID.3162.)  Dr. Sherman "looked at" the report, saw that it was "a normal EKG," "took a look [at note written on the report by the nurse] to see why they ordered it," and signed off on the results. (Dr. Sherman Dep. at 81-82, ECF No. 95-14, PageID.2839.)  Plaintiff says that Dr. Sherman was deliberately indifferent because he "did not ask [the nurse] to elaborate on her notes," did not "ask her any questions about [AD] Milline's condition," and did not send

30

AD Milline to a specialist" or prescribe "preventive medication." (Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2383.)

This argument fails to account both for the context in which Dr. Sherman reviewed the EKG report and for his understanding of AD Milline's plan of treatment at the time. Dr. Sherman reviewed the report after Olagbaiye had already been apprised of the report and taken action in response to it. As noted above, the EKG that was the subject of the report was performed on March 1 – the day before Dr. Sherman reviewed the report. The test was performed by LaFriniere. After LaFriniere completed the test, she faxed the results to Olagbaiye and informed Olagbaiye about AD Milline's symptoms and history of pulmonary emboli. (*See* LaFriniere Dep. at 29-31, ECF No. 95-20, PageID.2923.) Olagbaiye prescribed AD Milline 325 mg Tylenol three times per day for the next three days and 81 mg chewable aspirin once per day for 180 days. (*See* Medical Records, ECF No. 83, PageID.1606.) Olagbaiye also ordered that AD Milline's temperature be monitored twice a day for the next three days. (*See id*., PageID.1648.) Therefore, by the time Dr. Sherman reviewed the EKG report, the issues that had brought AD Milline to health services on March 1 had already been addressed by another health care professional, and Dr. Sherman was aware of that fact. Moreover, at the time Dr. Sherman reviewed the report, he believed that there was "a plan to take and follow up, to have a follow up visit with [AD Milline]." (Dr. Sherman Dep., ECF No. 95-

14 at PageID.2839-2840.)  Thus, contrary to Plaintiff's contention, at the time Dr. Sherman reviewed the EKG report, he understood that AD Milline *would* be receiving additional medical attention.   Under all of these circumstances, Dr. Sherman's failure to take additional action in response to the "normal" EKG findings of March 1 does not amount to deliberate indifference. *See Winkler v. Madison County,* 893 F.3d 877, 892-893 (6th Cir. 2018) ("Although [the defendant's] assessment and treatment of [the detainee] might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to [the detainee's] health.").

**4**

The final portion of Plaintiff's deliberate indifference claim is directed toward Olagbaiye.  Unlike the other individual Defendants, there may be a basis on which to conclude that Olagbaiye was deliberately indifferent to AD Milline's serious medical condition on at least one occasion.  On Friday, March 4, 2016, Deview called Olagbaiye and told him that AD Milline had an abnormal EKG and that his vital signs were abnormal. (*See* Medical Records, ECF No. 83, PageID1558-1566.) Even though Olagbaiye was aware of AD Milline's history of pulmonary emboli, he arguably failed to take meaningful action in response to the report he received.  He simply directed that AD Milline return to the medical unit for an evaluation three days later – on Monday, March 7.  And when Olagbaiye returned to the medical unit

on March 7, he did not prioritize seeing AD Milline.  AD Milline died of pulmonary emboli on the morning of March 7 without ever seeing Olagbaiye or another medical professional that day.

Olagbaiye testified that despite AD Milline's history, he did not believe that the abnormal EKG and vital signs were signs of serious distress on March 4. (*See* Olagbaiye Dep. at 124-127, ECF No. 82-2, PageID,1226-1227.)  But Plaintiff has presented expert testimony from Dr. Mahir Elder that the totality of the circumstances known to Olagbaiye on March 4 were so significant that it had to have been obvious to Olagabaiye that (1) AD Milline was suffering from a pulmonary embolism and (2) AD Milline needed immediate treatment and/or further further testing. (*See* Dr. Elder Dep. at 39-44, ECF No. 95-16, PageID.2865-2866.)    Dr. Elder's testimony could potentially support a finding that Olagbaiye was deliberately indifferent to AD Milline's serious medical needs on March 4th.

During the hearing on Defendants' motion, defense counsel offered several arguments as to why Dr. Elder's testimony is either inadmissible against Olagbaiye and/or insufficient to support a finding of deliberate indifference.  For instance, defense counsel argued that Dr. Elder is a medical doctor with a specialty in pulmonary emboli and that he is thus not an appropriate expert to offer an opinion as what a nurse practitioner like Olagbaiye would have and/or should have known and/or done.  Likewise, defense counsel argued that Dr. Elder's testimony does not

33

support the deliberate indifference claim against Olagbaiye because the testimony addresses only garden-variety medical standard-of-care issues that are relevant in a medical malpractice case but are not relevant in the context of a deliberate indifference claim.

The summary judgment briefing did not address in any detail the admissibility of Dr. Elder's expert testimony against Olagbaiye and whether that testimony is sufficient, when considered in the context of all of the other evidence, to support a deliberate indifference claim against Olagbaiye.  And the Court cannot reasonably determine whether the claim against Olagbaiye should be presented to a jury unless and until it resolves these issues.  Accordingly, the Court will deny the current motion for summary judgment on the deliberate indifference claim against Olagbaiye without prejudice and will permit Defendants to renew their motion for summary judgment on that claim.  In the renewed motion, the Defendants shall include any and all arguments they have as to (1) why Dr. Elder's testimony is inadmissible against Olagbaiye (under the Federal Rules of Evidence or otherwise) and (2) why Dr. Elder's testimony, in connection with all of the other evidence against Olagbaiye, is insufficient to establish that Olagbaiye acted with deliberate indifference on March 4, 2016, *or at any other time*.  Defendants shall also renew and further develop their argument that Plaintiff has not satisfied the objective component of his deliberate indifference claim with respect to Olagbaiye. Finally,

Defendants shall include in the motion all of their arguments as to why the deliberate indifference claim against Olagbaiye fails as a matter of law.

**5**

While the Court has determined that Plaintiff has failed to establish a deliberate indifference claim against each of the CCS Defendants (except for possibly Olagbaiye), the Court does not mean to suggest that the Defendants provided appropriate or reasonable medical care to AD Milline. The evidence, when viewed in Plaintiff's favor, may well be sufficient to support a finding that the care AD Milline received was meaningfully deficient and that at least some of the Defendants made significant medical errors.

While Defendants' apparent errors do not support a deliberate indifference claim (at least against all of the individual Defendants other than Olagbaiye), it seems that Plaintiff may have had a potential remedy for those errors. For instance, it appears that Plaintiff could have brought a claim against all of the CCS Defendants under state law for medical malpractice. *See*, *e.g.*, *Esch v. Yacob*, 2017 WL 2562621 (Mich. App. June 13, 2017) (recognizing potential availability of medical malpractice claim against employees of a private prison health care provider under Michigan law); *Rusha v. Edelman*, 2016 WL 5853160 (Mich. App. Oct. 4, 2016)

(same).[3]  And Plaintiff could have prevailed on that claim without having to establish – as he had to prove here – that the Defendants knowingly or recklessly disregarded a risk of substantial harm.  Had Plaintiff pursued a medical malpractice claim, the Court may well have allowed him to present that claim to a jury.

## C

The Court now turns to Plaintiff's supervisory liability claim against Dr. Sherman raised in Count III of the Second Amended Complaint.  This claim rests on Dr. Sherman's alleged failure to supervise Olagbaiye.  As Plaintiff acknowledges, in order to prevail on this claim, he must establish that Dr. Sherman "'encouraged the specific incident of misconduct'" by Olagbaiye or "'implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct'" of Olagbaiye. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Plaintiff has made neither showing.  He has not presented evidence that Dr. Sherman encouraged, authorized, approved, or knowingly acquiesced in any unconstitutional conduct by Olagbaiye.  Instead, Plaintiff argues that Dr. Sherman

---

[3] *See also Graham*, 358 F.3d at 385 ("Perhaps in recognition of the fact that her complaint is more properly remediable under state law, [plaintiff] has filed a medical malpractice lawsuit in Michigan state court against [defendant medical provider] and others arising from the same events that underlie this [deliberate indifference] lawsuit"); *Galloway v. Anuszkiewicz*, 518 F. App'x 330, (6th Cir. 2013) (noting that plaintiff's disagreement with jail staff "may be grounds for a state-law medical malpractice or wrongful death claim, but not a constitutional tort claim").

is liable because he was Olagbaiye's direct supervisor and because Olagbaiye "repeatedly acted with deliberate indifference." (Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID2398.)  That is not enough to hold Dr. Sherman liable on a supervisory liability theory.  As explained above, liability under that theory requires a showing that the supervisor-defendant knew of the unconstitutional conduct and did something to support or approve that conduct.  Plaintiff has not met that standard here.

Plaintiff argues in the alternative that Dr. Sherman may be held liable under a supervisory liability theory because Dr. Sherman allowed Olagbaiye to work a second job at a private clinic during hours that Olagbaiye was specifically on-call at the Macomb County Jail. (*Id.*)  But Plaintiff has not cited any evidence that Dr. Sherman knew that Olagbaiye's second job was causing Olagbaiye to commit constitutional violations while treating patients at the jail.  Therefore, the fact that Dr. Sherman allowed Olagbaiye to work a second job cannot support Plaintiff's supervisory liability theory against Dr. Sherman.

For all of these reasons, Dr. Sherman is entitled to summary judgment on Plaintiff's supervisory liability claim.

### D

The Court next turns to Plaintiff's claims against CCS and against certain CCS employees in their official capacities as pleaded in Count II of the Second Amended

Complaint.  As a matter of clarification, the claims against the employees in their official capacities are treated as claims against CCS, itself.  *See*, *e.g.*, *Leach v. Shelby Cty. Sherriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (explaining that "a suit under section 1983 against a defendant 'in his official capacity' is equivalent to a suit against the local government entity.") Thus, the official capacity claims against the CCS employees are duplicative of the claim against CCS, and there is no reason to present those claims to the jury as if the claims were being made against the CCS employees. *See Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 328 (6th Cir. 2013) ("Plaintiffs' claims against Bedell in his official capacity were properly dismissed because they were in actuality claims against the Township of Waterford, which is itself a defendant"); *Castleberry v. Cuyahoga Cty.*, 2020 WL 3261097, at *2 (N.D. Ohio June 16, 2020) (explaining that "early dismissal of official-capacity claims is both permitted and preferential when the municipal entity is also named as a defendant in the case").  Accordingly, the Court will treat all of Plaintiff's official capacity claims and allegations as being made against CCS, as an entity, and will present the claims to the jury, if at all, in that manner.

The Court declines to grant summary judgment in favor of CCS at this time. Defendants' attack on the claim against CCS reads like a motion to dismiss, rather than a motion for summary judgment.  Indeed, Defendants expressly "incorporate[d]" into their summary judgment brief "their argument supporting

dismissal of [this] claim[] as articulated in [Defendants' motion to dismiss]." (Mot. for Summ. J., ECF No. 82, PageID.1170.)    The Court concludes that the proper focus at this point in the proceedings is upon the evidence developed during discovery and whether that evidence, when viewed in the light most favorable to Plaintiff, is sufficient to create a jury question on the claims pleaded against CCS. Thus, the Court will deny the motion for summary judgment on the claim against CCS without prejudice.  However, it will permit Defendants to renew that motion.

In any renewed motion for summary judgment, Defendants should identify *evidence* (or a lack thereof) that supports their argument that CCS is entitled to summary judgment.  Among other things, Defendants should explain why CCS would be entitled to judgment as a matter of law if the Court were to conclude that Plaintiff has presented a viable deliberate indifference claim against Olagbaiye. Separately, Defendants should explain why CCS would be entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim if the Court were to conclude that (1) CCS knew (or recklessly disregarded the risk that) its employees were regularly committing medical malpractice, (2) CCS failed to take steps necessary to protect inmates from the recurring and expected malpractice of its employees, and (3) the malpractice of its employees proximately caused AD Milline's death.  Stated another way, Defendants should explain why CCS would be entitled to summary judgment on Plaintiff's Eighth Amendment claim if CCS knowingly implemented

and oversaw a system under which its employees were repeatedly committing acts of medical malpractice, and those acts of malpractice proximately caused AD Milline's death.

E

Finally, the Court addresses Plaintiff's state-law claims in Count V of the Second Amended Complaint.  In these claims, he asserts that the Defendants are liable for gross negligence and for intentional, willful, and wanton misconduct.  (*See* Sec. Amend. Comp., ECF No. 53.)   The Defendants argue that these claims fail as a matter of law because the allegations underlying (and evidence supporting) the claims sound in medical malpractice, and they fail because Plaintiff did not comply with the procedural requirements governing a medical malpractice action under Michigan law.  The Court agrees.

Under Michigan law, a claim that "sounds in" medical malpractice "is subject to the procedural and substantive requirements that govern medical malpractice actions." *Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004).  In order to determine whether a claim sounds in medical malpractice, a court must ask two questions: "(1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Id.*  With respect to the second question, "[i]f the reasonableness of the

40

health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Id.* at 872.  Here, the answers to both questions establish that Plaintiff's claims sound in medical malpractice.

First, it is clear that the claims arose in the context of the professional relationship between AD Milline and the Defendants acting in their capacity as health care providers.  Plaintiff does not contend otherwise.

Second, in order to evaluate the reasonableness of the Defendants' challenged actions, the jury must understand the relevant professional standards of care.  Indeed, one of the essential pillars of Plaintiff's case is the proposed expert testimony from Dr. Mahir Elder that all of the Defendants, *as medical professionals*, should have understood the immediate and urgent risks faced by AD Milline and that all of the Defendants fell below that standard.[4]   And Plaintiff highlights that Defendants' acts

---

[4] *See* Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2371-2372 (discussing Dr. Elder's deposition testimony that AD Milline's symptoms and history indicated the type of risk that, under the normal medical standard of care, should have been understood by Defendants as requiring emergency treatment and care).

and omissions fell below the prevailing professional standard of care.[5]  Moreover,

Plaintiff repeatedly contends that the harm to AD Milline was caused by CCS's

failure to provide sufficient training to its staff in areas such as "assessing and

documenting and responding to medical conditions of inmates specific to the jail

setting." (Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2395.)  Likewise,

Plaintiff complains that the CCS nurse Defendants were "not trained [to] recogniz[e]

urgent symptoms or on how to handle emergency situations inside the jail." (*Id.*,

PageID.2394.)  Plaintiff's arguments that the harm to AD Milline resulted from a

lack of specialized medical training underscores that a jury could evaluate the

alleged deficiencies here only after hearing expert medical testimony on the

applicable standard of care.  Simply put, the manner in which Plaintiff developed

and presented his claims confirms that they are intertwined with the professional

standards of care applicable to each of the Defendants and that they thus sound in

malpractice. *See*, *e.g.*, *Milkiewicz v. Genesee County*, 2019 WL 1757526, at ** 5-6

(E.D. Mich. Apr. 10, 2019) (denying plaintiff leave to amend to add state-law claim

against Corizon and its employees because the proposed claim was "an improper

---

[5] *See* Pla.'s Resp. to Mot. for Summ. J., ECF No. 95, PageID.2372 (quoting Dr. Elder's deposition testimony that "[t]he standard of care requires that AD Milline should've been transferred to a facility that could attend to his serious condition in a timely fashion."); *see also id.*, PageID.2381 ("OLAGBAIYE's failure to review the EKG results on that day, given the circumstances, was not simply negligent but a "gross deviation" from the applicable standard of care.").

claim for medical malpractice against the Corizon Defendants couched in a claim for negligence" and explaining that "the failure to 'properly train' individuals with 'care giving responsibilities' certainly is a matter outside of common knowledge requiring expert testimony" and is thus a claim that sounds in medical malpractice).

Plaintiff counters that his claims are like the one claim in *Bryant*, *supra,* that was deemed to sound in ordinary negligence, not medical malpractice. The Court disagrees. The claim at issue in *Bryant* was that nursing home staffers found a patient "tangled in her bedding and dangerously close to asphyxiating herself in the bed rails" and that the nursing home then did nothing to alleviate the risk of a future similar asphyxiation. *Bryant*, 684 N.W.2d at 875. The Michigan Supreme Court concluded that because even a layperson could understand that the nursing home should have taken some corrective action, the claim sounded in ordinary negligence. Here, in contrast, a layperson would not know how to assess the significance of AD Milline's complaints and/or the efficacy of the Defendants' responses to those complaints, nor would a layperson know whether Defendants' medical record keeping and consideration of AD Milline's medical history was minimally sufficient. *Bryant* therefore does not compel a conclusion that Plaintiff's claims sound in ordinary negligence.

Because Plaintiff's state-law claims sound in medical malpractice, Plaintiff was required to comply with the procedural requirements under Michigan law for

the commencement of a medical malpractice action.  He did not.   As Defendants accurately note, a plaintiff who brings a medical malpractice claim must include an affidavit of merit signed by a health professional that attests to the defendant's failure to meet the standard of patient care.  (*See* Def.'s Mot. Summ. J., ECF No. 82, PageID.1191, citing Mich. Comp. Laws § 600.2912d.)  In this case, Plaintiff did not include an affidavit of merit with his Complaint.  Because Plaintiff did not meet the prerequisites for a medical malpractice action under Michigan law, this Court dismisses Plaintiff's state law claims.

## V

For the reasons explained above, Plaintiff's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** as follows:

- The motion is **DENIED WITHOUT PREJUDICE** with respect to Plaintiff's claim that Defendants Olagbaiye and CCS violated AD Milline's rights under the Eighth Amendment.  Olagbaiye and CCS may file a renewed motion for summary judgment (addressing, among other things, the issues identified above for inclusion in such a motion) by not later than <u>January 6, 2021</u>.  If Olagbaiye and CCS file such a renewed motion, Plaintiff shall respond by <u>February 10, 2021</u>, and Olagbaiye and CCS may reply by <u>February 24, 2021</u>.

- The motion is **GRANTED** with respect to Plaintiff's claim that all of the other Defendants violated AD Milline's rights under the Eighth Amendment.

- The motion is **GRANTED** with respect to Plaintiff's gross negligence claim against all Defendants.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 30, 2020


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 30, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764