UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALVAREZ MILLINE, as Personal
Representative of the ESTATE of
ALVAREZ DEMETRIE MILLINE, Deceased

      Plaintiff,                          Case No. 17-cv-12723
                                            Hon. Matthew F. Leitman

v.

CORRECTCARE SOLUTIONS, L.L.C. *et al.*,

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART RENEWED MOTION FOR SUMMARY JUDGMENT BY
DEFENDANTS CORRECT CARE SOLUTIONS, L.L.C. AND
TEMITOPE OLAGBAIYE, NP (ECF No. 121)**

On March 7, 2016, Alverez Demetrie Milline ("AD Milline") tragically died

of a pulmonary embolism while in custody at the Macomb County Jail.  In this

action, the personal representative of AD Milline's estate ("Plaintiff[1]"), brings

Eighth Amendment deliberate indifference claims and state-law claims against

several health care professionals who treated AD Milline at the jail and against

Correct Care Solutions, L.L.C. ("CCS"), the private company that employed many

of those professionals.  The Court previously issued an Opinion and Order in which

---

[1] The Plaintiff is also named Alverez Milline.  For ease of reference, the Court will
refer to him as "Plaintiff."

it (1) granted summary judgment in favor of all Defendants on Plaintiff's state-law claims, (2) granted summary judgment in favor of all Defendants other than CCS and nurse practitioner Temitope Olagbaiye on Plaintiff's Eighth Amendment deliberate indifference claims, (3) denied without prejudice summary judgment on Plaintiff's Eighth Amendment deliberate indifference claims against CCS and Olagbaiye, and (4) granted CCS and Olagbaiye leave to file a renewed motion for summary judgment on Plaintiff's Eighth Amendment claims. (*See* Op. and Order, ECF No. 117.)  CCS and Olagbaiye have now filed a renewed motion for summary judgment on Plaintiff's Eighth Amendment deliberate indifference claims. (*See* Ren. Mot., ECF No. 121.)  For the reasons explained below, CCS is entitled to summary judgment, but Olagbaiye is not.  The motion is therefore **GRANTED** with respect to CCS but **DENIED** with respect to Olagbaiye.

## I

The Court set forth the factual background of Plaintiff's claims at length and in detail in its prior Opinion and Order. (*See* Op. and Order, ECF No. 117, PageID.3661-3674.)  The Court incorporates that background into this Opinion and Order and will not repeat the background in depth here.

The essential facts underlying the current motion by CCS and Olagbaiye are as follows.  AD Milline began serving a criminal sentence in the Macomb County Jail in May 2015.  Around that same time, AD Milline informed CCS staff that he

had a history of pulmonary emboli. (*See* Dep. of Avery Hope, Nurse at the Macomb County Jail, at 15, ECF No. 95-10, PageID.2739; *see also* Medical Records, ECF No. 83, PageID.1647.)  CCS staff then scheduled AD Milline for an evaluation by Olagbaiye so that he (Olagbaiye) could specifically follow up on AD Milline's reported history of emboli. (*See* Medical Records, ECF No. 83, PageID.1497.)  That evaluation was scheduled for May 19, 2015. (*See id.*)  However, AD Milline refused to be seen by Olagbaiye because AD Milline did not have the funds to pay for the evaluation. (*See id.*)  Even though Olagbaiye had been informed that AD Milline had a history of pulmonary emboli, Olagbaiye did not order any of AD Milline's medical records in May of 2015.   In fact, Olagbaiye never ordered those records. (*See* Olagbaiye Dep. at 152-53, ECF No. 95-13, PageID.2816-2817.)

On June 30, 2015, AD Milline complained of chest and/or rib pain, and a CCS nurse performed an EKG on him. (*See* Medical Records, ECF No. 83, PageID.1622.) The nurse then gave the test results to Olagbaiye. (*See id*.)  Olagbaiye determined that the results were normal, and he prescribed Tylenol for AD Milline. (*See id*., PageID.1609.)

On July 13, Olagbaiye scheduled a sick call visit with AD Milline to evaluate AD Milline's multiple complaints of chest pain. (*See id*., PageID.1605.)   That evaluation took place the next day. (*See id.*)  At the time of the sick call, AD Milline

reported that he was feeling better, and he declined to be evaluated. (*See id.*, PageID.1495.)

On March 1, 2016, AD Milline reported to the jail medical unit complaining of chest pain. (*See id.*, PageID.1567.)   He described a burning sensation with movement causing increased pain. (*See id.*)  A CCS nurse found his vital signs to be within normal limits. (*See id.*, PageID.1569-1570.)  She also administered an EKG test, and the results of that test were normal. (*See id.*, PageID.1499.)  She then contacted Olagbaiye to report the findings. (*See* Dep. of Allison LaFriniere, Nurse at the Macomb County Jail, at 29, ECF No. 95-20, PageID.2923.)  Olagbaiye prescribed 325 mg of Tylenol three times per day for three days and one 81 mg tablet of chewable aspirin for 180 days. (*See* Medical Records, ECF No. 83, PageID.1606.) He also directed staff to take AD Milline's temperature twice per day for the next three days. (*See id.*, PageID.1648.)

On March 4, 2016, at approximately 5:42 p.m., AD Milline returned to the jail medical unit complaining of chest pain and shortness of breath. (*See id.*, PageID.1558-1566.)  A CCS nurse measured AD Milline's heart rate as 111 beats per minute – an abnormally elevated rate. (*See id.*, PageID.1560.)  She then administered an EKG test.  The result of this test came back abnormal.  More specifically, the result showed "moderate right-precordial repolarization disturbance" and suggested consideration of "ischemia or LV overload." (*Id.*,

PageID.1498.)  The result also indicated that AD Milline's heart rate was 98 beats per minute, not the 111 beats previously detected by the CCS nurse. (*See id.*)

The nurse who detected the elevated heart rate and administered the EKG test then called Olagbaiye to report the results of her examination and of the test. (*See id.*, PageID.1620; *see also* Olagbaiye Dep. at 121, ECF No. 95-13, PageID.2809.) At the time of the nurse's call, Olagbaiye was "on-call" but was not "in [the] facility" at the Macomb County Jail. (Olagbaiye Dep. at 120-121, ECF No. 95-13, PageID.2808-2809.)  Instead, Olagbaiye was working off-site at his second job at the AM Medical Center. (*See id.* at 35-36, 149, PageID.2787, 2816.)  After listening to the nurse's report, Olagbaiye concluded that no further action was required at that time.  Olagbaiye directed that AD Milline be brought to the health unit for evaluation on Monday, March 7 – when Olagbaiye would be back in the unit. (*See* Medical Records, ECF No. 83, PageID.1621.)  Olagbaiye also directed the nurse to tell AD Milline to return to the medical unit if his symptoms worsened over the weekend. (*See id.*)

When Olagbaiye arrived in the medical unit on the morning of March 7, he did not immediately summon AD Milline for an evaluation.  Olagbaiye explained that he had "tons and tons of [patients] to review." (Olagbaiye Dep. at 132-33, ECF No. 95-13, PageID.2811-2812.)  Olagbaiye did not consider AD Milline to be an

immediate priority even though AD Milline had both abnormal EKG and a history of pulmonary emboli.

At approximately 11:18 a.m. on March 7, AD Milline was brought to the medical unit complaining of trouble breathing. (*See* Medical Records, ECF No. 83, PageID.1612.)  He stopped responding to commands and lost consciousness. (*See id.*)  Olagbaiye then called for an ambulance. (*See id.*)  Staff commenced CPR and used an automated external defibrillator on AD Milline. (*See id.*)  AD Milline was then taken to McLaren Hospital where he was pronounced dead. (*See id.*, PageID.1611.)

The medical examiner who performed the autopsy on AD Milline determined that he "died of a pulmonary thromboembolism and that there were thromboemboli in both lungs that were acute, meaning that they were in the range of, could be hours to days old, and there were organizing clots, which would be older, possibly in the range of weeks to months to years old." (Dep. of Dr. Daniel Spitz at 11-12, ECF No. 82-6, PageID.1309.)

The Court highlights and summarizes other facts below as appropriate and necessary to the Court's analysis.

## II

The Court applies the well-established summary judgment standard to the motion by Olagbaiye and CCS.  Under that standard, a movant is entitled to summary

judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## III

### A

Plaintiff brings his claims against Olagbaiye and CCS under 42 U.S.C. § 1983. "To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cty.*, 805 F.3d 724,

736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)).  "The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Id.* (quoting *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).

**B**

"The Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cty., Ky.*, 975 F.3d 554, 566 (6th Cir. 2020).  *See also Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  This obligation arises under the Eighth Amendment to the United States Constitution, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle,* 429 U.S. at 104).

An Eighth Amendment claim "has two components, one objective and one subjective." *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014).  The contours of those components are well-established.

"The objective component requires the existence of a 'sufficiently serious' medical need." *Jones,* 625 F.3d at 941 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  This type of need includes one "that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quotation omitted).

"The subjective element requires 'an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Id.* (quoting *Blackmore,* 390 F.3d at 895). "Officials have a sufficiently culpable state of mind where officials act with 'deliberate indifference' to a serious medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834). "Under this standard, 'the plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Griffith*, 975 F.3d at 568 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)). "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001)).

"[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones,* 625 F.3d at 944. As the Sixth Circuit has explained, "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment," federal courts hesitate to review "medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw,* 358 F.3d 377, 385 (6th Cir. 2004). *See also*

*Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Groce v. Correctional Medical Svcs., Inc.*, 400 F. App'x 986, 986, 988 (6th Cir. 2010) (affirming district court holding that "treatment at issue amounted, at most, to medical malpractice rather than the sort of deliberate indifference needed to establish a constitutional claim" and noting that "[o]rdinary medical malpractice does not satisfy the subjective component" of a deliberate indifference claim). "However, the Sixth Circuit has also recognized that [p]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. Indeed, deliberate indifference may be established in cases where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment." *Jones*, 625 F.3d at 944-45 (internal punctuation omitted).

## IV

The Court turns first to Plaintiff's claim that Olagbaiye was deliberately indifferent to AD Milline's serious medical needs. While the question is a very close one, the Court concludes that Plaintiff's evidence is sufficient to create a genuine question of material fact on both the objective and subjective components of Plaintiff's deliberate indifference claim against Olagbaiye. Therefore, Olagbaiye is not entitled to summary judgment.

**A**

**1**

The evidence in the record is sufficient to create a material factual dispute on the objective component of the claim against Olagbaiye.  That evidence, when viewed in the light most favorable to Plaintiff, supports an inference that AD Milline suffered from a serious medical need while under Olagbaiye's care.  First, Plaintiff's medical expert, Dr. Mahir Elder, testified that AD Milline had an obvious and urgent need for immediate hospitalization and testing when he presented at the jail's health unit on March 4, 2016, with a known history of pulmonary emboli, an elevated heart rate, and an abnormal EKG. (*See* Dep. of Dr. Mahir Elder at 41-43, ECF No. 82-4, PageID.1266.)  That testimony, standing alone, is sufficient to establish that AD Milline suffered from a serious medical need while under Olagbaiye's care.

Second, as noted above, AD Milline's autopsy confirmed that he suffered from (1) organizing emboli that had likely been present in his lungs for weeks or months before his death and (2) acute emboli that could have developed in the days preceding his death. (*See* Dr. Spitz Dep. at 11-12, ECF No. 82-6, PageID.1309.)  The autopsy results are sufficient to support a finding that AD Milline suffered from pulmonary emboli while under Olagbaiye's care, and such emboli – which can be deadly – plainly rise to the level of a serious medical condition. *See Bennett v. Carter Cty. Bd. of Comm'rs.*, 2019 WL 1671979, at * 5 (E.D. Okla. 2019) (holding that

plaintiff satisfied objective component of deliberate indifference claim by showing that decedent died as a result of a pulmonary embolism).  In sum, Plaintiff satisfied the objective component of his claim by presenting evidence that (1) AD Milline's observed condition on March 4th required urgent medical attention and (2) the subsequent autopsy confirmed that AD Milline suffered from deadly pulmonary emboli.

## 2

Defendants counter that as a matter of law Plaintiff cannot satisfy the objective component of his deliberate indifference claim because AD Milline was not formally "diagnosed with [pulmonary emboli] while at the Macomb County Jail." (Ren. Mot., ECF No. 121, PageID.3856.)  This argument fails for two reasons.

First, the argument ignores that Dr. Elder testified that even in the absence of a formal diagnosis of pulmonary emboli, AD Milline's observable condition (combined with his known medical history on March 4th) required urgent medical attention.  As explained above, that testimony, if believed by a jury, is sufficient to establish that AD Milline's observable condition and known medical history, on their own, amounted to a serious medical need.

Second, Sixth Circuit precedent confirms that a serious medical condition can sometimes satisfy the objective component of a deliberate indifference claim even where the condition is first formally diagnosed after the patient's death.  For

instance, in *Winkler v. Madison County*, 893 F.3d 877, 890-91 (6th Cir. 2018), the

Sixth Circuit held that there was "no question" that a decedent's duodenal ulcer –

first discovered after his death – satisfied the objective component of the plaintiff's

deliberate indifference claim where the ulcer "ultimately caused [the decedent's]

death." The Sixth Circuit reached the same conclusion in *Rouster*, *supra*, another

case involving an inmate with an ulcer that was first diagnosed after his death:

> A plaintiff satisfies the objective component by alleging
> that the prisoner has a medical need that was sufficiently
> serious. It is clear that [the inmate] suffered from a
> serious, indeed dire, medical need while he was held at
> Saginaw. He had a perforated duodenum, which leaked
> toxic materials into his abdominal cavity and caused
> internal bleeding. [The inmate] was held at Saginaw for
> only a few days, but within that time he succumbed to
> sepsis and died. Clearly then, [the inmate] had an
> objectively serious need for medical treatment.

*Rouster*, 749 F.3d at 446.[2]  Thus, the fact that AD Milline was first formally

diagnosed with a pulmonary embolism after his death does not preclude Plaintiff

from establishing the objective element of his deliberate indifference claim. *See*

*Hubble v. County of Macomb*, 2019 WL 1778862, at *19 (E.D. Mich. 2019) (holding

that undiagnosed sepsis amounted to a serious medical condition that satisfied the

---

[2] The Sixth Circuit did not suggest in either *Rouster* or *Winkler* that the objective
component of a deliberate indifference claim was satisfied because before the
inmates died, they had suffered from symptoms that were "so obvious that even a
lay person would easily recognize the necessity for a doctor's attention." *Jones v.
Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010).

objective component of a deliberate indifference claim and collecting cases holding that other undiagnosed serious conditions also satisfied the objective component).[3]

In addition to conflicting with precedent, Defendants' position – that a formal diagnosis is essential to satisfy the objective component whenever a lay person would not recognize the need for immediate treatment – suffers from additional flaws. For instance, it creates perverse incentives for jail doctors *not* to diagnose inmates. Likewise, it fails to account for the fact that some serious – indeed, life threatening – conditions would be reasonably apparent to jail doctors even though they cannot be formally diagnosed in a jail setting, and it immunizes jail doctors for their conduct in connection with these conditions even where they act with reckless

---

[3] In many cases, defendants do not even dispute that a serious condition that went undiagnosed could satisfy the objective component of a deliberate indifference claim. *See*, *e.g.*, *North v. Cuyahoga County*, 754 F. App'x 380, 387 (6th Cir. 2018) (defendant did not dispute that undiagnosed endocarditis satisfied objective component of deliberate indifference claim); *Perry v. Talbot*, 2021 WL 781290, at *3 (S.D. Ind. Mar. 1, 2021) (noting that defendant did "not dispute that [plaintiff's] undiagnosed, untreated diabetes was a serious medical condition" and "proceed[ing] directly" to subjective component of deliberate indifference claim).

disregard for an inmate's health and safety.[4]   Simply put, Defendants' approach would leave a gaping hole in the Eighth Amendment.   And for that reason, Defendants' formal-diagnosis-is-essential position cannot be correct.

### 3

Defendants also argue that Plaintiff cannot satisfy the objective component of his claim because the evidence does not show that AD Milline was suffering from the pulmonary embolism that caused his death when Olagbaiye last treated him on March 4th. (*See* Ren. Mot., ECF No. 121, PageID.3857.)   In support of this argument, Defendants highlight the medical examiner's testimony that acute emboli contributed to AD Milline's death and that they most likely developed a day or two

---

[4] Bacterial meningitis is an example of one such condition.   The classic symptoms of this condition include headache, fever, stiff neck upon examination, nausea, and sensitivity to light. *See* https://www.cdc.gov/meningitis/bacterial.html#symptoms (last visited August 2, 2021.)   While these symptoms – which are roughly consistent with a migraine headache – would not necessarily alert a lay person that medical attention is essential, a physician who examined an inmate presenting with these symptoms could well strongly suspect that the inmate was suffering from possible meningitis.   But the condition cannot be formally diagnosed without a blood test and/or spinal tap.   Under Defendants' approach, a jail physician could not be held liable under the Eighth Amendment if, after examining a jail inmate with classic symptoms of meningitis, the physician recognized that the inmate was likely suffering from that ailment (which the physician could not definitively diagnose without one of the aforementioned tests), and the physician nonetheless intentionally withheld treatment.   Defendants' approach would unreasonably immunize the physician under these circumstances because the inmate's condition had not been formally diagnosed through a spinal tap or blood test at the time the physician withheld treatment.

before his death (*i.e.*, on March 5 or 6). (*See id.*, citing Dr. Spitz Dep. at 50, PageID.1319.)

There are two problems with this argument. First, Plaintiff's ability to establish the objective component of his claim does not depend upon his ability to show that on March 4th, AD Milline was suffering from the precise pulmonary embolism that ultimately caused his death. Plaintiff can satisfy the objective component through Dr. Elder's testimony that AD Milline was in urgent need of medical treatment on March 4th in light of his symptoms and medical history. That testimony – especially when coupled with the medical examiner's testimony that AD Milline suffered from organizing pulmonary emboli as of March 4th – is more than enough to establish the objective component of Plaintiff's deliberate indifference claim. Second (and in any event), the medical examiner's testimony did not preclude the possibility that the emboli that caused AD Milline's death were present on March 4th. For these reasons, the Court declines to grant summary judgment on the ground that AD Milline was not suffering from fatal pulmonary emboli when Olagbaiye last saw him on March 4th.

**B**

**1**

The evidence in the record is also sufficient to create a material factual dispute as to the subjective element of the deliberate indifference claim against Olagbaiye.

16

The Sixth Circuit has offered the following guidance for assessing the subjective element:

> A plaintiff satisfies the subjective component by "alleg[ing] facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001). The subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* (citing *Estelle,* 429 U.S. at 106, 97 S.Ct. 285). We have described the mental state of a prison official who has been deliberately indifferent to a prisoner's medical needs as akin to recklessness:
>
> > When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."
>
> *Id.* (internal citations omitted) (quoting *Farmer,* 511 U.S. at 835–36, 114 S.Ct. 1970). The plaintiff bears the burden of proving subjective knowledge, but he may do so with ordinary methods of proof, including by using circumstantial evidence. *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. Indeed, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

*Rouster*, 749 F.3d at 446-47.   In addition, a "particular defendant's level of knowledge and training also must be considered in the subjective analysis." *Hubble*, 2019 WL 1778862, at *14 (citing *Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478, 484 (6th Cir. 2014).   Finally, "[e]xpert testimony that speaks to the obviousness of a risk can be used to demonstrate a dispute of material fact regarding whether a prison doctor exhibited conscious disregard for the plaintiff's health." *Id*. (quoting *Smith v. Campbell County*, 2019 WL 1338895, at *14 (E.D. Ky. 2019)).

The following evidence, when viewed in the light most favorable to Plaintiff, is sufficient to support inferences that Olagbaiye (1) subjectively perceived facts from which he could infer that AD Milline faced a substantial risk of serious harm, (2) did in fact draw that inference, and (3) then disregarded that risk:

- Olagbaiye had substantial medical education, including a medical degree from a Nigerian medical school and three degrees in nursing from North American colleges. (*See* Olagbaiye Dep. at 6-12, ECF No. 95-13, PageID.2780-2781.) This medical training included instruction concerning "the signs and symptoms of someone at risk for a pulmonary embolism." (*Id*. at 48-49, PageID.2790-2791.)

- Olagbaiye had substantial experience working as a medical professional. This experience included general medical practice in Nigeria and many years working as a nurse and nurse practitioner in the United States. (*Id.* at 6-17, PageID.2780-2783.)

18

- As of March 4, 2016, Olagbaiye was aware that AD Milline had a pre-incarceration history of pulmonary emboli. (*See id.* at 41-43, 94, PageID.2789, 2802.)  As of March 4, 2016, Olagbaiye was also aware that AD Milline complained of chest pains while incarcerated. (*See id.*; *see also id.* at 83, 91-92, PageID.2799, 2801.)  Despite that knowledge, Olagbaiye did not order AD Milline's medical records. (*See id.* at 152-53, PageID.2816-2817.)

-  On March 4, 2016, Olagbaiye was informed that AD Milline was experiencing chest pains, that his heart rate had been measured at around 110 or 111 beats per minute (*see id.* at 130, PageID.2811), and that AD Milline's EKG test result was abnormal. (*See id.* at 125, PageID.2810.) When confronted with that information, Olagbaiye did not direct the nurse to take an additional set of vitals or to continue to actively monitor AD Milline's vitals, did not direct that any additional testing be performed on AD Milline, did not arrange for additional monitoring of AD Milline, did not prescribe any new treatment, and did not arrange for AD Milline to be hospitalized. Instead, Olagbaiye asked the nurse to put AD Milline on the list to be seen on Monday (three days later) when Olagbaiye returned to the jail. (*See id.* at 130, PageID.1228.)

- According to Dr. Elder, "any medical professional" who was aware of these circumstances, would have "understood" that it was necessary to "start immediate treatment" for a pulmonary embolism. (Dr. Elder Dep. at 41-42, ECF No. 82-4, PageID.1266.)  The need for immediate treatment was underscored by, among other things, the difference in the EKG test result of March 4, 2016, as compared to prior EKG test results. (*See id.* at 50-51, PageID.1268.)  Dr. Elder stressed that "because the risk of death is

19

very high, you treat immediately, and so there is no delay, then you diagnose." (*Id.* at 43, PageID.1266.)

- Dr. Elder added that Olagbaiye's failure to follow this course of action was more serious than "just med[ical] mal[practice]." (*Id.* at 46, PageID.1266.) Indeed, in Dr. Elder's opinion, the care provided by Olagbaiye on March 4, 2016, was "so inadequate as to amount to no treatment at all." (*Id.* at 11-12, PageID.1258.)

- Even Defendants' own nurse practitioner expert witness acknowledged that (1) given AD Milline's circumstances, he "would [have] tr[ied] to get the history documentation" (*i.e.*, AD Milline's medical records) and (2) when AD Milline's EKG came back abnormal and his heart rate was measured at least once on March 4, 2016, at 111 beats per minute, AD Milline "was going to require probably some additional monitoring of vital signs to see if he, you know, returns to tachycardia." (Dep. of Michael McMunn, N.P., at 55, 97, ECF No. 100-1, PageID.3481, 3492.)

Given this evidence, a jury could reasonably conclude that Olagbaiye (1) recognized that AD Milline was suffering from a pulmonary embolism, (2) understood that immediate treatment was necessary and that without such treatment AD Milline faced a serious risk of a grave outcome, and (3) disregarded that risk. *See Lemarbe v. Wisneski*, 266 F.3d 429, 436-38 (6th Cir. 2001) (holding that a jury could reasonably infer that defendant-physician drew inference of substantial risk of serious harm where expert witness testified, among other things, that the risk "was extreme and obvious to anyone with a medical education").

**2**

Defendants offer serious and thoughtful counterarguments as to why Plaintiff's evidence is insufficient to satisfy the subjective element of his claim, but none persuade the Court that Plaintiff's evidence falls short.

First, Defendants highlight that Dr. Elder made a number of references to deviations from the "standard of care," and they argue that Dr. Elder's opinion thus sounds in medical malpractice rather than deliberate indifference.  However, while Dr. Elder did mention the standard of care, as noted above, he also unequivocally testified that Olagbaiye's lack of care for AD Milline was tantamount to no treatment at all and was "not just" medical malpractice. (Dr. Elder Dep. at 11-12, 46, ECF No. 82-4, PageID.1258, 1267.)

Second, Defendants argue that Dr. Elder's testimony is inadmissible against Olagbaiye – and thus cannot be the basis for sustaining the subjective element of Plaintiff's claim – because Dr. Elder's opinions "are inappropriately founded in his extensive background in diagnosing, treating, researching, and publishing on pulmonary embolisms." (Ren. Mot., ECF No. 121, PageID.3866.)  Defendants insist that Dr. Elder inappropriately held Olagbaiye to a higher level of care than could be expected of a nurse practitioner without extensive training in pulmonary emboli. (*See id*., PageID.3867.)  But while Dr. Elder certainly has an extensive background in the diagnosis and treatment of pulmonary emboli, he was careful to say that "*any*

21

medical professional" would have recognized the immediate severe risk to AD Milline's health. (Dr. Elder Dep. at 41-42, ECF No. 82-4, PageID.1266; emphasis added.)  Thus, Dr. Elder did not hold Olagbaiye to an unfairly high (or unfairly prejudicial) standard of care.  Moreover, Olagbaiye has far more medical training than many other nurse practitioners.  He has a medical degree from a Nigerian medical school and numerous nursing degrees from North American colleges. Given Olagbaiye's background, Dr. Elder may fairly opine as to what he (Olagbaiye) must have known.  Notably, Defendants have not identified for the Court any decision in which any federal court has excluded testimony like Dr. Elder's on the grounds urged by Defendants here and under circumstances like those presented here.

Third, Defendants argue that Olagbaiye did not fail to provide treatment but, instead, left in place the treatment plan he had previously prescribed. (*See* Ren. Mot., ECF No. 121, PageID.3861.)  However, Dr. Elder testified that the existing treatment plan was wholly inappropriate for a patient with AD Milline's history and symptoms and amounted to no treatment at all. (*See* Dr. Elder Dep. at 11-12, 38, ECF No. 82-4, PageID.1258, 1265.)  In light of Dr. Elder's testimony, Defendants are not entitled to summary judgment on the ground that Olagbaiye left his prior treatment regimen in place.

Fourth, Defendants highlight that Olagbaiye's interactions show genuine concern for AD Milline. They note, for instance, that on at least one occasion (prior to March 4, 2016), Olagbaiye scheduled an evaluation of AD Milline "of his own accord" because he was concerned about AD Milline's chest pain and history of pulmonary emboli. (Ren. Mot., ECF No. 121, PageID.3860.) While this conduct by Olagbaiye may help to persuade a jury that Olagbaiye did not ever act with deliberate indifference, it does not compel that conclusion – especially when this conduct by Olagbaiye occurred nearly one year before the critical events of March 4, 2016.

Finally, Defendants argue that the Sixth Circuit's decisions in *Rouster* and *Rhinehart*, *supra*, compel the conclusion that Olagbaiye did not act with deliberate indifference. The Court respectfully disagrees and finds that both cases are distinguishable. In *Rouster*, the plaintiff brought a deliberate indifference claim against several jail medical staff members who failed to diagnose an inmate's ulcer. The Sixth Circuit held that the claim failed as a matter of law because the plaintiff did not present sufficient evidence that the defendants were subjectively aware of the risks to the inmate. However, the Sixth Circuit stressed that the jail staff "did not have one very critical piece of information, which might have allowed [the court] to draw a very different conclusion: [the staffer] did not know that [the inmate] had been treated the previous year for a duodenal ulcer." *Rouster*, 749 F.3d at 448-49. The Sixth Circuit said that if the jail staff "had received full information regarding

[the inmate's] medical history, we could easily conclude that [they] were deliberately indifferent to [the inmate's] needs." *Id*. at 453.  Here, in sharp contrast, Olagbaiye *did* know that AD Milline had a history of pulmonary emboli.  Thus, *Rouster* actually provides some support to Plaintiff's claim that Olagbaiye acted with deliberate indifference when, despite his knowledge of AD Milline's medical history, he did not treat AD Milline for a pulmonary embolism on March 4th.

In *Rhinehart*, the plaintiff alleged that prison physicians were deliberately indifferent to his serious medical needs when they provided allegedly-deficient care for his end-stage liver disease.  The Sixth Circuit held that the plaintiff could not establish that the physicians acted with deliberate indifference because, among other things, he failed "to present medical proof" that certain courses of treatment not pursued by the physicians "was necessary," *Rhinehart*, 894 F.3d at 740; one of the physicians prescribed a medication for his condition that was a "recognized treatment" in the "medical literature" cited by the plaintiff, *id*. at 743-44; the plaintiff failed to present evidence that "any doctor would have known" that an inmate in his condition was a candidate for the treatment he sought, *id*. at 748-49; and one of the other physicians consulted with a physician colleague and weighed the risks and benefits before deciding against the course of treatment sought by the plaintiff. *See id*. at 750-51.  Here, unlike in *Rhinehart*, Plaintiff did present evidence that any medical professional would have recognized the need to treat AD Milline for a

24

pulmonary embolism; Olagbaiye did not treat AD Milline in accordance with standards set forth in any literature cited by Plaintiff; and there is no evidence that Olagbaiye consulted with anyone when he failed to take action on March 4, 2016. Thus, *Rhinehart* does not compel dismissal of Plaintiff's deliberate indifference claim against Olagbaiye.

3

For all of the reasons explained above, the evidence presented by Plaintiff is sufficient to create a material factual dispute on all of the elements of Plaintiff's deliberate indifference claim against Olagbaiye.  The Court will therefore deny Defendants' motion for summary judgment on that claim.

V

The Court now turns to Plaintiff's deliberate indifference claim against CCS. Defendants are entitled to summary judgment on that claim.

A

Plaintiff's claim against CCS under 42 U.S.C. § 1983 is treated like "claims premised upon [municipal] liability pursuant to" *Monell v. Department of Social Services*, 436 U.S. 658, (1978). *Martin v. Warren County, Kentucky*, 799 F. App'x 329, 341 (6th Cir. 2020) (evaluating claim against private entity that provided health

care to jail inmates under the *Monell* standard).[5]   Under the governing *Monell*
standard, an entity "may not be held liable under § 1983 on a *respondeat*
*superior* theory—in other words, *solely* because it employs a tortfeasor." *Jackson v.*
*City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quotation omitted; emphasis
in original).   Rather, *"*a plaintiff must show that through its deliberate conduct, the
municipality was the moving force behind the injury alleged." *Id.* (quotation
omitted).   A plaintiff makes that showing by presenting evidence "that the
municipality had a 'policy or custom' that caused the violation of his rights." *Id.*
(quoting *Monell*, 436 U.S. at 694).   "There are four methods of showing the
municipality had such a policy or custom: the plaintiff may prove (1) the existence
of an illegal official policy or legislative enactment; (2) that an official with final
decision making authority ratified illegal actions; (3) the existence of a policy of
inadequate training or supervision; or (4) the existence of a custom of tolerance or
acquiescence of federal rights violations." *Id.* (quotation omitted).

## B

Plaintiff appears to proceed under the first, third, and fourth methods of
proving liability.   Plaintiff argues that "CCS's policies, customs, and practices
undergird a culture of widespread ineptitude" that has "proven fatal" more than once,

---

[5] *See also Winkler v. Madison County*, 893 F.3d 877, 904 (6th Cir. 2018) (applying
*Monell* standard to claim against private entity that provided health care to jail
inmates).

including in this case. (Pl's. Resp., ECF No. 125, PageID.3979.)  Plaintiff further

contends that "CCS's failure to train and/or supervise its employees evidences a

deliberate indifference to the rights of its patients…." (*Id*.)

In CCS' motion for summary judgment, CCS cited evidence that tends to

support its position that it did not fail to train its employees and did not have customs,

policies, or practices that caused violations of inmates' constitutional rights. (*See*

Ren. Mot., ECF No. 121, PageID.3841-3847.)  That evidence was sufficient to

satisfy CCS' burden of production as the moving party and to shift to Plaintiff the

burden of identifying evidence in the record that created a genuine dispute of

material fact on these issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

(describing initial burden of production and shifting of burden in summary judgment

context).  Plaintiff failed to carry his burden.

Plaintiff's response does not identify evidence in the record that creates a

material factual dispute on any of his theories of liability under *Monell*.  Indeed,

Plaintiff's response cites barely any *evidence* at all *concerning CCS' practices,

training, or policies*.  Instead, Plaintiff focuses almost exclusively on bad outcomes

at the Macomb County Jail (and elsewhere) since CCS began overseeing medical

care at the jail:

> Defendant Olagbaiye is not the *only* CCS employee who
> has violated the constitutional rights of patients.  In 2011,
> Macomb County entered into an "Inmate Health are [sic]
> Services Management Agreement" with CCS whereby

CCS would provide "comprehensive institutional healthcare services for MCJ." (ECF 95-5). Interestingly, since 2012, more than 20 people have died at MCJ. Aside from MCJ, Defendant CCS holds government contracts with more than 500 other facilities across 34 states. (ECF 95-6). Over the past decade, Defendant CCS has been sued at least 1,396 times in federal courts. (ECF 95-7). Notably, CNN reports, after "review[ing] hundreds of federal and local lawsuits filed against CCS between 2014 and 2018," that Defendant CCS has been successfully sued for substandard care in approximately 200 lawsuits, 70 of which involved inmate deaths. (ECF 95-6).

That means, in a four-year span, fourteen percent (14%) of the lawsuits filed within the last decade were successful against Defendant CCS, and of those, thirty-five percent (35%) stemmed from an inmate's death. These numbers reflect an astonishing and discouraging trend as it pertains to Defendant CCS' standard of care and/or deliberate indifference towards its patients.

According to former Defendant CCS Health Service Administrator, David Arft, Defendant CCS at MCJ experienced problems with bringing patients to medical within an appropriate amount of time. (ECF 95-9 p. 38 ln 4-15). Additionally, due to the overcrowded inmate population at MCJ, coupled with Defendant CCS being understaffed, Defendant CCS employees with little experience see "hundreds" if inmates a day. (ECF 95-10 p.6 ln 18-19; p. 7 ln 11; p. 14, ln 5-13). Surprisingly, Defendant CCS staffs only two health care providers at any time – a physician and a part-time nurse practitioner – for MCJ which houses approximately 1,200 inmates. Just because Defendant CCS claims to have "implemented" various policies and procedures, does not mean they are being *followed or adhered to* by its employees. If Defendant CCS employees fully complied with the policies and procedures as set forth in Defendants' instant motion, then its complaint rate would drop, its number of lawsuits would diminish, and most importantly, the death

rate would be arguably nonexistent. Instead, an old adage applies – "actions speak louder than words."

The staffing problems and increased mortality rate, alone, beg questions regarding Defendant CCS' customs, policies and/or acquiesced behavior by its employees. No medical expertise or training is necessary to understand that conditions at MCJ under CCS are ripe for disaster. Indeed, as the instant case demonstrates, CCS' policies, customs and practices undergird a culture of widespread ineptitude and carelessness that has, *on more than one occasion*, proven fatal to those individuals under its care. Here, CCS's failure to train and/or supervise its employees evidences a deliberate indifference to the rights of its patients, and its policies, customs, and or acquiesced practices are actionable under §1983. Thus, Plaintiff has more than satisfied the requirement that CCS' customs, policies and/or acquiescence has been identified and linked to unconstitutional and, often times deadly patterns and activities, specifically as it relates to Olagbaiye's indifference to Plaintiff's medical needs.

(Pl's. Resp., ECF No. 125, PageID.3977-3979.)

The two record citations that Plaintiff did include in this passage concerning CCS' practices fall far short of creating a material factual dispute as to CCS' liability under the *Monell* standard. At the cited page of Mr. Arft's deposition, he said only that "in some [unidentified number of] cases" inmates were not being brought to health services quickly enough. (Arft Dep. at 38, ECF No. 95-9, PageID.2720.) And the deposition excerpts at ECF Number 95-10 state only that one registered nurse saw hundreds of patients per day. (*See* Dep. of Avery Hope at 6, 7, and 14, ECF No.

95-10, PageID.2737, 2739.)  These two snippets of testimony do not establish that CCS had *any* jail-wide policies, practices, customs, or lack of training.

Moreover, Plaintiff has failed to direct the Court to evidence that any CCS policy, custom, practice, or lack of training was the "moving force" behind AD Milline's death. Plaintiff's medical expert, Dr. Elder, opined that AD Milline died because Olagbaiye made grossly improper medical decisions concerning AD Milline's medical care on March 4, 2016 (and to a lesser extent on the few days beforehand). (*See* Dr. Elder Dep. at 38-46, ECF No. 82-4, PageID. 1265-1267.) Plaintiff has not presented *proof* that Olagbaiye's allegedly gross dereliction of duty was caused by a policy, practice, or custom of CCS, or by CCS' failure to train Olagbaiye.  Indeed, the passage quoted above makes no real effort to draw any specific connection between any act or omission and CCS, on the one hand, and Olagbaiye's alleged deficiencies, on the other hand.  Accordingly, Defendants are entitled to summary judgment on the claim against CCS. *See Graham ex rel. Estate of Graham*, 358 F.3d at 385 (affirming grant of summary judgment and holding that "[e]ven if [the decedent] received constitutionally inadequate medical care, there [was] simply no evidence that [a] policy was the 'moving force' behind that constitutional violation"); *Gray v. City of Detroit*, 399 F.3d 612, 616-17 (6th Cir. 2005) (affirming grant of summary judgment and holding that there was "[n]o

[e]vidence" that the "a [p]olicy or [c]ustom" of the defendant was the "[m]oving [f]orce" behind the alleged violation of plaintiff's constitutional rights").

For all of these reasons, Plaintiff's claim against CCS fails as a matter of law.

## VI

For the reasons explained above, Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's Eighth Amendment deliberate indifference claim against CCS and is **DENIED** with respect to Plaintiff's Eighth Amendment deliberate indifference claim against Olagbaiye.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 3, 2021


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 3, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764